UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RESIDENTIAL MANAGEMENT (NY) INC.,

              Plaintiff,

                                                                                 MEMORANDUM AND
      -against-                                          ORDER

FEDERAL INSURANCE COMPANY,               11-CV-1206
                                                                      (WFK)(SMG)
             Defendant.
-------------------------------------------------------------------X

**KUNTZ, United States District Judge**

Plaintiff Residential Management (NY) Inc. d/b/a 611 West 158th Street Corp. ("Plaintiff") commenced this action against Defendant Federal Insurance Company ("Defendant") in the Supreme Court of the State of New York for the County of Kings on February 17, 2011. The action was removed to this Court on March 14, 2011. Plaintiff owns and operates the subject premises located at 611 West 158th Street in New York, New York (the "Building"). Plaintiff brings this action for an alleged breach of an insurance policy arising out of the denial of its claim for the alleged collapse of a steel frame that supported a water tank at the Building. The parties filed cross-motions for summary judgment. For the reasons set forth below, Defendant's motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied.

**I.    Factual Background**

Defendant issued an insurance policy naming Plaintiff as the insured, effective June 29, 2010 to June 29, 2011 (the "Policy"). Pl.'s Ex. B (Policy 79593183-02). A location schedule to the Policy designates the Building as Location No. 60, Building No. 1 and indicates it is insured for special causes of loss to limits of $7,078,240 for real property, $10,000 for personal property,

and $537,960 for rental value. *Id.* A named insured schedule to the Policy names the Building as insured. *Id.* The Building has nine (9) stories and forty-four (44) apartments. Pl.'s Ex. E (Dep. of R. Diaz), Tr. 9:8–19. There is one tank located on the roof of the Building; the tank is wooden and is supported by a steel frame. The tank contains water for use in a fire suppression system. *Id.* at 20:9–24. In June 2010, Mr. Ramon Diaz was the superintendent of the Building, where he had worked for approximately sixteen (16) years as an employee of Plaintiff. His manager was Mr. Sam Becker. *Id.* at 7:14–10:25. Mr. Diaz testified the steel support frame had been present sixteen (16) years earlier when he began his employment at the Building. *Id.* at 21:25–22:14.

### A. Alleged Collapse

On June 23, 2010 and June 28, 2010, Richard Pacheco, an employee of Plaintiff's plumber George Bomzer & Sons, and a helper named "Sean" performed work on the roof of the Building underneath the water tank in response to a report of a leak. Pl.'s Ex. C (Dep. of R. Pacheco), Tr. 18:18–21:16; 51:10–53:12. Mr. Pacheco inspected an apartment and the roof. He determined the tank was not the source of the leak, but rather the leak originated in a four-inch pipe extending from the tank into the interior of the building. *Id.* at 19:3–26:20.

On June 28, 2010, Mr. Pacheco was removing debris from the area where the leaking pipe penetrated the roof and observed "the tank felt closer to [his] back." *Id.* at 35:20–25. He was kneeling down beneath the tank when he "noticed the tank leaned a little bit." *Id.* at 36:14–37:14. Mr. Pacheco estimated the space between the tank and the surface of the roof had diminished by approximately two (2) inches. He explained a part of the tank in the area of the parapet wall was not "sitting properly" and "the tank was leaning." He notified his boss Alan Bomzer and Mr. Diaz. Subsequently, he drained the tank. *Id.* at 42:3–43:12; 47:11–48:19.

2

Both Mr. Diaz and Mr. Bomzer notified Mr. Becker about the condition of the tank. Pl.'s Ex. E, Tr. 46:20–47:4; Def.'s Ex. M (Dep. of S. Becker), Tr. 61:8–12. Mr. Becker called the Rosenwach Tank Company and asked to have someone respond immediately to the Building. *Id.* at 68:13–69:3. In response to Mr. Becker's call, Joseph Smizaski, Director of Operations of Rosenwach Tank Company, went to the Building at some point in June 2010. Def.'s Ex. O (Dep. of J. Smizaski), Tr. 12:25–13:4; 20:6–12. Mr. Smizaski went up to the roof and "saw the tank structure that supported the wood tank leaning and the tank was leaning . . . ." *Id.* at 24:6–10. He observed a beam had "collapsed or had dropped," and, as he got closer, he "could see that the beam was like just almost sawed in half from rust over a period of time." *Id.* at 24:11–16; 27:1–7. Mr. Smizaski testified the wooden tank appeared to be intact, and he did not observe any damage to the wooden tank. *Id.* at 29:10–14.

On July 29, 2010, Michael Davis, a York Risk Services Group Senior Adjuster, was assigned to certify the cause of the alleged tank collapse at the Building. Def.'s Ex. N (Dep. of M. Davis), Tr. 13:14–14:13. On August 5, 2010, Mr. Davis inspected the tank and its support structure. *Id.* at 31:9–19; Def.'s Ex. I (Davis Report). He observed that the tank was undamaged, but that rust on a joint of the support structure had caused the structure to separate from a parapet wall and shift out of alignment. Def.'s Ex. N, Tr. 32:2–12; Def.'s Ex. I. "Due to the rusted joint, the water tank was slightly tilted out of alignment, but the unit remained standing, and the tank did not sustain any damage." Def.'s Ex. I.

In September 2010, York Risk Services Group assigned Edward M. Deegan, Jr., M.S., P.E., of Engineering Design and Testing Corp., to prepare a report assessing what had caused the displacement of the steel frame supporting the water tank at the Building. Deegan Aff., at ¶ 4; *see* Ex. D (Deegan C.V.). On September 21, 2010, Mr. Deegan went to the Building. He was

3

able to observe the steel support frame, but not the water tank because it had been drained and removed. Deegan Aff., at ¶ 5. Based on his education and experience as a professional engineer and his own observations of the steel support frame, Mr. Deegan made the following findings:

> (1) Displacement of a steel support frame for a rooftop water tank at [the Building] is the result of inadequate support at the northeast corner.
> (2) Inadequate support at the northeast corner is the result of corrosion of an L-shaped column at the northeast corner of the support frame.
> (3) Corrosion of the L-shaped column at the northeast corner of the support frame is the result of a lack of maintenance on the part of the building owner.
> (4) The cause of displacement of the support structure of the steel support frame for a rooftop water tank at [the Building] is a lack of maintenance on the part of the building owner.
> (5) Corrosion of the steel support frame is long-term in nature, as indicated by the loss of section to the L-shaped column.

Ex. E, at 3 (Deegan Report).

Despite the alleged collapse, the Building remained fully occupied and domestic water service was unaffected. No tenant vacated the building. Pl.'s Ex E, Tr. 55:20–22; Def.'s Ex. M, Tr. 99:12–22. At some point, employees of the Rosenwach Tank Company removed the water tank from the steel support frame. Pl.'s Ex. E, Tr. 81:13–20. The steel support frame was still standing as of September 21, 2010. Deegan Aff., at ¶ 16. After completing its investigation, Defendant determined the damage was not a covered loss under the Policy and denied Plaintiff's claim in a letter dated November 4, 2010. Def.'s Ex. K (Letter from H. Master to H. Roth).

### B. Relevant Policy Provisions

The Policy provides Defendant "will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." Pl.'s Ex. B. A Covered Cause of Loss includes risks of direct physical loss, unless the loss is excluded under Section B of the Policy (Exclusions) or limited under Section C of the Policy (Limitations). Sections

B.2.d.(1)–(2) exclude coverage for "[w]ear and tear" and "[r]ust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself." Section B.2.k excludes coverage for "[c]ollapse, except as provided below in the Additional Coverage for Collapse."

The Additional Coverage for Collapse section adds back coverage for collapse, but only to the extent the Policy defines "collapse" and only when due to one of the causes specified in Section D. Section D.1.a defines "collapse" as an "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." Sections D.1.b–d further define what is not considered to be in a state of collapse as "[a] building or any part of a building that is in danger of falling down or caving in," "part of a building that is standing," or "[a] building that is standing or any part of a building that is standing . . . even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion." Section D.2 provides Defendant will pay for direct physical loss or damage if the collapse is caused by one or more of the following: breakage of building glass, hidden decay, insect or vermin damage, weight of people or personal property, or use of defective material or methods in construction.

## II. Standard Of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v.*

5

*Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal citations and quotations omitted). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

If the moving party satisfies this burden, the non-moving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986). Importantly, if the evidence produced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250 (1986) (internal citations omitted).

Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000)). Thus, even if both parties move for summary judgment and assert the absence of any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121 (internal citation omitted).

### III. Analysis

Under New York law, an insurance policy must be interpreted so that a clear and unambiguous policy provision is given its plain and ordinary meaning. *U.S. Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232, 501 N.Y.S.2d 790 (1986). "[C]ourts should refrain from rewriting the agreement." *Id.* Ambiguities are generally resolved in the insured's favor. *Id.* The issue before this Court is whether the Policy in question covers the type of loss sustained by Plaintiff.

Plaintiff argues the water tank and steel support frame collapsed on or about June 30, 2010 and, consequently, is a covered loss within the meaning of the Policy. Pl's Mem. of Law in Supp. of its Mot. for Summ. J. ("Pl's Mot."), at 5. Defendant argues there was no collapse because Plaintiff's motion only establishes the steel support frame shifted or tilted; Plaintiff does not establish the event was a "collapse" as the Policy defines the term. Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n"), at 2. Even if Plaintiff is able to demonstrate the displacement of the steel support frame and water tank constitutes a collapse under the Policy, Defendant argues Plaintiff has failed to prove the steel support frame tiled because of "hidden decay." *Id.*

#### A. Plaintiff Has Not Established There Was A Collapse As Defined Under The Policy

The Policy provides Defendant will not pay for loss or damage caused directly or indirectly by "[c]ollapse, except as provided . . . in the Additional Coverage for Collapse." Section B.2.k. Consequently, the Additional Coverage for Collapse section provides the source of coverage for any so-called collapse. The Court agrees with Defendant's reading of the Additional Coverage for Collapse section as imposing a two-prong test: (1) there must be an event that meets the Additional Coverage for Collapse definition of "collapse;" and (2) the

7

purported collapse must result from one of the causes of loss specified in the Additional Coverage for Collapse section. Sections D.1.a–d of the Policy define "collapse as follows:

> a) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;
> b) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;
> c) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;
> d) A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

The undisputed evidence before this Court establishes the steel support frame and water tank remained standing, although in a leaning condition, and did not abruptly fall down or cave in at any point. The Building remained fully occupied for its intended purpose as an apartment building throughout the events as described *supra*.

New York courts have reviewed identical policy language and determined the language is unambiguous as to what constitutes a "collapse." In *Rector St. Food Enterprise, LTD. v. Fire & Casualty Insurance Co. of Connecticut*, the court found the collapse language was unambiguous and held there was not a collapse because, although the building was sinking and leaning, it was still standing. 35 A.D.3d 177, 827 N.Y.S.2d 18 (1st Dept. 2006). The operative policy specifically provided additional coverage for collapse and defined the term as "an abrupt falling down or caving in" and further provided that "[a] building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." *Id.* Given the policy's definition, a building that had large cracks in its façade and was sinking, out of plumbing, and leaning, but nevertheless indisputably

8

standing in the hours before its demolition, had not "collapsed" for purpose of the policy's additional coverage provision. *Id.* Likewise, in *Rapp B. Properties, LLC v. RLI Insurance Co.*, the court held the collapse provision was unambiguous and did not cover imminent collapse where building was still standing. 65 A.D.3d 923, 885 N.Y.S.2d 283 (1st Dept. 2009); *see also Bella-Vita LLC v. Tower Ins. Co. of New York*, 29 Misc. 3d 1233(A), 920 N.Y.S.2d 239 (Sup. Ct. 2010) (granting summary judgment in favor of defendant-insurer, having determined "a building in danger of collapsing is not covered under the policy . . . 'even if it shows evidence of cracking, bulging, sagging [or] bending.'").

Here, the Policy supplies a clear definition of "collapse" to clarify any potential ambiguity. *See Dalton v. Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88, 93 (2d Cir. 2009). The Second Circuit in *Dalton*, confronted with different policy language, determined it to be ambiguous and susceptible to two reasonable interpretations. However, the court expressly noted that "other insurers in New York have used forms that speak much more directly to the dispute involve here." *Id.* (citing *Rector St.*, 827 N.Y.S.2d at 18). The court proceeded to discuss the application of *Rector St.* in a footnote:

> The holding . . . in *Rector St.*, . . . is not useful in resolving the meaning of the policy in the present case because the policy in *Rector St.* contained express definitional terms . . . . It provided, for example, that a collapse was "an abrupt falling down or caving in" and that "a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, . . . or expansion." *Id.* Because the *Rector St.* policy provided a definition of collapse agreed to by the parties, which addresses the ambiguity, the court's ruling is not a useful indicator of how the New York courts would rule in the absence of an agreed definition.

*Dalton*, 557 F.3d at 92 n.1. New York courts have held the specific policy language at issue in this case to be unambiguous. The Court agrees and finds Plaintiff fails to meet the first requirement under the Additional Coverage for Collapse section of the Policy. The event

9

that occurred on or about June 30, 2010 does not constitute a "collapse" as defined by the Policy.

### B. Plaintiff Fails To Demonstrate The Alleged Collapse Was Caused By One Of The Specified Causes Of Loss Under The Policy

Even if Plaintiff had established the occurrence of a collapse as defined under the Policy, Plaintiff failed to meet the second prong of the two-part test under the Additional Coverage for Collapse section. Plaintiff offered no evidence the alleged collapse was caused by "[d]ecay that is hidden from view" or any other causes of loss as provided under the Additional Coverage for Collapse section.

Under the Section D.2 of the Policy, Defendant agreed to pay for direct physical loss or damage caused by a collapse of a building, or any part of a building, if the collapse was caused by one or more of the following:

> a) The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;
> b) Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
> c) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;
> d) Weight of people or personal property;
> e) Weight of rain that collects on a roof;
> f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in 2.a. through 2.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

Plaintiff contends the alleged collapse was the result of hidden decay, and therefore, it is entitled to coverage. Pl. Decl. in Opp'n to Federal's Mot. for Summ. J. ("Pl's Decl."), at ¶ 8. To support this contention, Plaintiff offers the testimony of Mr. Diaz who, "prior to the loss, [ ] did

regularly visit the roof and inspect the water tank, and noticed no evidence of corrosion, sagging or collapse of said tank." Pl.'s 56.1, at ¶ 6; Pl.'s Decl., at ¶ 5. The Court does not find this testimony substantiates a finding that hidden decay in fact caused the steel support frame to shift out of alignment. Mr. Diaz testified part of his job was to check the drains on the roof once per week. Pl.'s Ex. E, Tr. 16:17–19. He testified he had "to look at the roof completely, that everything is okay." *Id.* at 17:2–6. Mr. Diaz did *not* testify he regularly "inspect[ed] the water tank" as Plaintiff states in its Rule. 56.1 Statement, at ¶ 6. Mr. Diaz did not describe any sort of regular examination of the steel support frame and water tank. Other than asserting Mr. Diaz denied noticing any corrosion, Plaintiff offers no evidence to support its claim that hidden decay resulted in the so-called collapse. This Court finds a dearth of evidence that rust and corrosion of the steel support frame was hidden.

Plaintiff also indicates the water tank was two (2) years old at the time of the loss. Pl.'s 56.1, at ¶ 6; Pl.'s Decl., at ¶ 5. In doing so, Plaintiff attempts to argue this fact supports the conclusion the water tank was in good condition. The Court notes it was not the water tank that allegedly collapsed, but the steel support frame which became displaced. In fact, Mr. Deegan explains in his sworn affidavit that the use of rivets and square-shaped nuts to join the steel frame's components indicate it was several decades old. Deegan Aff., at ¶ 6. Additionally, Mr. Diaz testified the steel support frame was approximately sixteen (16) years old because it had been there since he began working at the Building. Pl.'s Ex. E, Tr. 22:7–14. The Court does not find the age of the water tank to be indicative of the condition and maintenance of the steel support frame.

Defendant rebuts the arguments of Plaintiff by presenting evidence that rust and corrosion led directly to the shifting and misalignment of the steel support frame. Pursuant to the

exclusions to the policy, the parties agreed Defendant "will not pay for loss or damage caused by or resulting from . . . [r]ust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself . . . ." Section B.2.d.(2). Defendant offers the sworn affidavit and report of Mr. Deegan who concluded corrosion developed over a lengthy period of time and led ultimately to the leaning condition of the steel frame. Deegan Aff., at ¶ 15. Direct observations of the steel support frame and water tank by Mr. Davis support Mr. Deegan's conclusion. Mr. Davis stated he observed open and obvious rust on sections of the steel support frame that had no roof sealant coating during his August 5, 2010 inspection. Davis Aff., at ¶ 8. Furthermore, the presence of extensive rust and corrosion is apparent in photographs of the steel support frame. Def.'s Exs. F, H.

The undisputed facts show the water tank and steel support frame did not collapse as defined in the Policy. The event cannot be described as an "abrupt falling down or caving in . . . with the result that the building or part of the building [could] not be occupied for its intended purpose." Section D.1.a. New York courts have reached the same conclusion when confronted with identical policy language. Having established there was no collapse, the causation of the loss is immaterial. Nevertheless, the Court does not find hidden decay resulted in the leaning condition of the water tank and steel support frame. Rather, evidence produced by Defendant indicates rust and corrosion led to the shifting of the steel support frame, and therefore any loss is excluded under the Policy.

## IV. Conclusion

Plaintiff has not established the event resulting in the loss is covered by the Policy. Plaintiff fails to meet the requirements under the Additional Coverage for Collapse provision of the Policy: (1) the occurrence does not meet the definition of collapse, and (2) the alleged

collapse is not the result of a specified cause of loss, including hidden decay. Accordingly, this Court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's motion for summary judgment. The complaint is dismissed in its entirety with prejudice.

**SO ORDERED**

Dated: Brooklyn, New York
August 10, 2012

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge